IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-02766-RMR-NRN

WILMAR PEREZ,
RUBY ORANTES,
EDGAR SUAREZ ACEROS,
ALEXIS CALDERON, and
GOJHAN SIERRA,

      Plaintiffs,

v.

DENCO CONSTRUCTION LLC d/b/a DENCO,
ROA CONSTRUCTION LLC,
ABC COMPANIES 1-10 (names fictitious),
BRUCE RAHMANI,
YESSICA ROA, and
JOHN DOES 1-10 (names fictitious) individually,

      Defendants.

---

**ORDER ON**
**PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER AND CORRECTIVE NOTICE**
**TO THE POTENTIAL FLSA COLLECTIVE AND CLASS (ECF No. 59)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

      This case is before the Court pursuant to an Order issued by Judge Regina M.

Rodriguez, ECF No. 62, referring Plaintiffs Wilmar Perez and Ruby Orantes' Motion for

a Protective Order and Corrective Notice to the Potential FLSA Collective and Class,

filed February 10, 2025. ECF No. 59. Defendants Denco Construction LLC and Bruce

Rahmani (together, the "Denco Defendants") filed a response, ECF No. 87, and

Plaintiffs Perez, Orantes, and Edgar Suarez Aceros filed a reply, ECF No. 91. The Court

held an Evidentiary Hearing on the Motion for Protective Order on March 11, 2025. ECF

No. 95. After the hearing, the parties filed proposed findings of fact and conclusions of law. ECF Nos. 104-1 & 114.

The Court has taken judicial notice of the case file and considered the applicable federal and state statutes and case law. As set forth below, it is hereby **ORDERED** that Plaintiffs Perez and Orantes' Motion for a Protective Order and Corrective Notice to the Potential FLSA Collective and Class, ECF No. 59, is **DENIED** in part and **GRANTED** in part.

## I.    BACKGROUND[1]

### a.  Procedural History

Perez, Orantes, and Daniel Fuentes were formerly employed by the Denco Defendants as construction workers. ECF No. 1 ¶¶ 50, 66, 75. On October 7, 2024, they filed the original Collective Action Complaint for Unpaid Wages bringing a collective claim for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and individual claims under the Colorado Wage Act ("CWA"), Colo. Rev. Stat. § 8-4-101, et seq., and the Colorado Overtime and Minimum Pay Standards Order ("COMPS"), 7 Colo. Code Regs. § 1103-1, based on allegations that the Denco Defendants failed to properly pay overtime wages. *See generally id.* On November 4, 2024, the Court granted Fuentes' motion to withdraw from this lawsuit. ECF No. 12. On November 20, 2024, Plaintiffs moved for conditional certification of the FLSA collective action. ECF No. 13.

---

[1] Any citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

On December 18, 2024, the Court granted Plaintiffs Perez and Orantes' motion to file the First Amended Class and Collective Action Complaint for Unpaid Wages, bringing a collective action FLSA claim and new class action claims under the CWA and COMPS against the Denco Defendants. ECF No. 24.

On February 10, 2025, on behalf of Plaintiffs Perez and Orantes, Plaintiffs' counsel filed the subject Motion for a Protective Order and Corrective Notice to the Potential FLSA Collective and Class. ECF No. 59.

On February 11, 2025, the Court granted the motion for leave to file a Second Amended Complaint, ECF No. 63, and on February 17, 2025, Plaintiffs' counsel filed a Second Amended Complaint on behalf of Perez, Orantes, and new Plaintiff Suarez, bringing the same class and collective action claims against the Denco Defendants, and new Defendants Roa Construction Group LLC and Yessica Roa (together, "Roa Defendants"). ECF No. 64. The Court also denied without prejudice Plaintiffs' motion for conditional certification of the FLSA collective action, with the expectation that Plaintiffs will be filing a revised motion for conditional certification. ECF No. 63.

On February 23, 2025, Plaintiffs filed a second motion for conditional certification of the FLSA collective action. ECF No. 70.

On April 3, 2025, the Denco Defendants filed the Motion to Enforce Settlement Agreements, requesting that the Court enforce the settlement agreements between Denco and Perez, Orantes, and Suarez. ECF No. 112.[2]

On April 23, 2025, the Court granted an unopposed motion for leave to file a Third Amended Complaint, and Plaintiffs' counsel filed the now-operative Third

---

[2] The Court will address this motion in a future recommendation.

Amended Complaint on behalf of Perez, Orantes, Suarez, and new Plaintiffs Alexis Calderon and Gojhan Sierra, bringing the same class and collective action claims against the Denco Defendants and the Roa Defendants. ECF No. 117. In light of the new operative pleading, the Court denied Plaintiffs' second motion for conditional certification of the FLSA collective action. ECF No. 116.

On May 7, 2025, Plaintiffs filed a third motion for conditional certification of the FLSA collective action, ECF No. 131, which the Court now grants simultaneously with this Order.

## II.  MOTION FOR A PROTECTIVE ORDER AND CORRECTIVE NOTICE TO THE POTENTIAL FLSA COLLECTIVE AND CLASS (ECF No. 59)

### a.  Plaintiffs' Counsel's Initial Assertions and Relief Requested

The subject motion requests that the Court intervene to limit certain communications and invalidate previously signed settlement agreements between the Denco Defendants and Denco employees. ECF No. 59. The motion alleges that the Denco Defendants are requiring employees who (for the most part) only speak Spanish to sign an English-language document which purportedly prevents them from joining this lawsuit. ECF No. 59 at 1. Perez states in a declaration that an unnamed current Denco employee told him:

> Denco is requiring all their employees to release their wage and hour claims against Denco for $500. If they do not sign this document, they will be fired. He told me that he go[t] this document in English. This Denco employee, like myself, is a native Spanish speaker with a limited ability to understand English.

ECF No. 59-2 at 1–2.

Plaintiffs' counsel requests relief that is both retrospective and prospective. Regarding retrospective relief, Plaintiffs' counsel requests that the Court order that the

$500 Release that the Denco Defendants are allegedly "requiring their employees to sign," which purports to "prevent[] them from joining this lawsuit," is unenforceable, invalid, and should be stricken. ECF No. 59 at 1, 13–15. Regarding prospective relief, Plaintiffs' counsel requests that the Court enter a protective order that prohibits the Denco Defendants or their counsel "from seeking executed Releases from the putative class and collective members," further prohibits "Defendants from continuing to discuss the pending action with its employees," and generally prohibits Defendants "from engaging in other communications with putative class and collective class members that may otherwise undermine their rights in this lawsuit." *Id.* at 1, 12 n.4, 15. Plaintiffs' counsel further requests that the Court order the Denco Defendants to "give employees notice of this lawsuit." *Id.* at 12 n.4.

### b.  March 11, 2025 Evidentiary Hearing

The Court held an evidentiary hearing on the motion on March 11, 2025. *See* ECF Nos. 95 (minutes) & 98 (transcript). With respect to the assertion that employees are threatened with firing if they do not sign the document, no testimony or exhibits were provided in support and Plaintiffs' counsel acknowledged that this assertion was based upon hearsay and withdrew it. ECF No. 98 at 8:6-12.[3]

### i.  Exhibits

The exhibits admitted at the hearing show that a total of 66 current or former Denco employees signed settlement agreements with Denco from October 2024 through February 2025. Pls.' Hr'g Ex. 1 (copies of all purported settlement agreements

---

[3] Although not admissible as evidence, the Court notes that when it asked defense counsel if these threats were occurring, defense counsel stated that they were not. *Id.* at 9:8–10.

signed by Plaintiffs and other non-party Denco employees, and copies of the checks issued to these individuals); 2 (summary of all purported settlement agreements in Pls.' Hr'g Ex. 1). In 61 instances, the interaction occurred in December 2024, the agreement was provided only in English, and the employee received a check for exactly $500. Pls.' Hr'g Ex. 2. With respect to Suarez, he signed the agreement in November 2024 and received a check for $500 in December 2024.

Only four current or former employees received more than $500. On October 25, 2024, Daniel Fuentes and Gerardo Vidal received checks for $15,000 and $8,000, respectively, and Rudy Orantes and Wilmar Perez each received checks for $12,000 on February 13, 2025. *Id.* Orantes and Perez were the only employees to also receive a Spanish version of the document. *Id.*

The Court summarizes the relevant portions of the agreements as follows.[4] The documents are titled "Confidential Settlement Agreement, Release, and Covenant Not to Sue." The agreements do not reference this lawsuit. *See generally* Pls.' Hr'g Ex. 1. The agreements are three pages long, single-spaced. Regarding the purpose of the agreement, the document states:

> This Agreement is entered into by the Parties to resolve any disputes that the Parties may have that in any manner relate to, arise out of, or involve any aspect of Employee's employment with the Company, including, but not limited to, any alleged owed and unpaid overtime compensation.

Pls.' Hr'g Ex. 3. Regarding the "settlement payment," the document states:

> In consideration for Employee's entry into this Agreement and the resulting acceptance of the terms and obligations of this Agreement, including but not limited to the waiver and release of all claims against the Company, as

---

[4] While the Court has not compared each of the 66 agreements submitted into evidence, it notes that the main provisions appear to be identical, and counsel has not drawn the Court's attention to any important distinctions.

is described in paragraph 7 below, and subject to the other provisions of this Agreement, the Company shall pay Employee the total gross sum of $_____, less all applicable withholdings and deductions (the "Settlement Payment").

*Id.* Regarding the employee's "release of claims," the document states:

In exchange for the Settlement Payment and in consideration of the agreements set forth in this Agreement, Employee hereby releases and discharges the Company and any successor, predecessor, parent, affiliate, or subsidiary company of the Company, their present and former officers, directors, employees, agents, representatives, legal representatives, accountants, attorneys, insurers, reinsurers, successors, and assigns (collectively "Released Parties"), from all claims, demands, and actions of any nature, known or unknown, that Employee may have against Released Parties that in any manner relate to, arise out of, or involve any aspect of Employee's employment with the Company, including but not limited to, any rights or claims under [numerous federal and state laws and regulations including the FLSA, CWA, and COMPS]. . . . This release and waiver further include any and all claims concerning attorney fees, costs, and any and all other expenses related to the claims released in this Agreement.

*Id.* The document also states that "Employee acknowledges that he or she has had the opportunity to consult with an attorney prior to executing this Agreement." *Id.*

### ii.  Testimony

The Court heard testimony from Perez, Suarez, and Denco supervisor Jorge Meza. All testimony was heard through a Spanish language interpreter, and testimony established that most Denco employees communicate primarily in Spanish. ECF No. 98 at 33:5–12.

### 1.  Perez

Perez previously worked for Denco as a laborer and an electrician from September 2019 through June 2024. ECF No. 98 at 29:21–30:4. It is undisputed that in September 2024, a few months after Perez's employment with Denco ended, Plaintiffs' counsel sent a demand letter to Denco on behalf of Perez. ECF No. 114 at 4. Within 14

days, Perez received a check from Denco for $16,572.27.[5] Defs.' Hr'g Ex. 1. Perez did

not sign anything in exchange for receiving this check. ECF No. 98 at 40:13–15. Plaintiff

cashed the check and paid Plaintiffs' counsel approximately $5,000. ECF No. 98 at

39:19–40:25.

Perez further testified that Denco employees (including Jorge Meza and Andres

Rodriguez) called Perez on the phone "several times" to attempt to "give [him] a

settlement" in the form of money and a promise to give him his job back. ECF No. 98 at

33:19–34:12. In February 2025, Perez signed a document (in English and Spanish)

presented to him by Rodriguez. Upon signing, Rodriguez provided Perez with a check

for $12,000, with "legal settlement" written in the memo line. *Id.* at 35:5–36:7; Pls.' Hr'g

Ex. 1 at 1.[6] Perez testified that he settled his claims "because of financial

considerations" and that he "was pressured because [he] was in a situation of wrong

money." ECF No. 98 at 45:16–46:12. Perez was represented by Plaintiffs' counsel at

the time, but did not talk with Plaintiffs' counsel before signing this document "because

they were pressuring me that I wouldn't receive any money, so I didn't talk to him." *Id.* at

46:17–25. Perez testified that Denco representatives encouraged him to settle directly

with them and not use his lawyer. ECF No. 98 at 35:1–4 ("They always told me that the

money that they were giving to the lawyers would not be given to me and it would be

better for me to settle with them so that I wouldn't lose my money."). Perez's highest

---

[5] The Court notes that it is Defendants' counsel's position that this payment was
made pursuant to CWA, which provides that an employer may resolve a CWA claim by
making an unconditional tender of funds within 14 days of a demand. ECF No. 98 at
17:13-20.

[6] The Court notes that it is Defendants' counsel's position that this payment
resolved Perez's remaining claims in this lawsuit. ECF No. 98 at 18:6–11.

level of education is tenth grade, and he does not understand spoken or written English. ECF No. 98 at 28:25–29:15.

### 2. Suarez

Suarez testified that he attended school until he was 16 years old, he is 53 years old, and he arrived in the United States two years ago. ECF No. 98 at 51:1–10. He speaks Spanish and does not understand English, other than the words "yes" and "no." *Id.* at 51:11-16. He worked for Denco from November 2023 to July 2024 as an electrician's assistant and in other roles. *Id.* at 51:17-23.

Suarez testified that as of November 2024, approximately four months after his employment with Denco ended, he was aware of "the lawsuit." *Id.* at 59:21-23.[7] Suarez told Meza that he did not want to go through the process of a lawsuit. ECF No. 98 at 58:23–59:23 ("I don't want to go through any process. I just want my job. I'd rather let's settle it in a good way."). Also in November 2024, Suarez did not have a job, and Meza helped him obtain a painting job from someone named Marta at "the Hotel Comfort." ECF No. 98 at 53:22–54:11, 59:18–20. Suarez testified that Marta gave him an English language document to sign. ECF No. 98 at 55:18–24; Pls.' Hr'g Ex. 3 (settlement agreement for $500). He signed the document on November 11, 2024, after "Marta . . . told me I had to sign the W-9 which is for taxes, and then this, which is for insurance." ECF No. 98 at 55:10–13. The day that Suarez signed the document, he started working for Marta, who paid him for the work. *Id.* at 62:5–13.

---

[7] However, Suarez later gave conflicting testimony that he only became aware of this lawsuit in January 2025 after speaking with Perez. ECF No. 98 at 62:25-63:6.

Suarez testified that he received a $500 check from Denco in January 2025 and that Meza told him that the check "was a return of money from the IRS." *Id.* at 56:9–57:8; 61:1–4 ("[W]hen I talked to [Mr. Meza] he said it's okay that money is an IRS refund to Denco, and since you worked for Denco it's being divided among all of the people who worked for Denco.").

Suarez continued to work for Marta into February 2025. *Id.* at 62:14–19. On February 13, 2025, after this work ended, Suarez told Meza that he would sue Denco in connection with his "hours that weren't paid" because Denco was no longer giving him any more work. *Id.* at 61:15–62:4. As of that day, Suarez was unaware that the $500 check he had received pertained to this lawsuit. *Id.* at 57:23–58:13.

### 3. Jorge Meza – Witness for Denco

Meza has been employed by Denco full-time as a supervisor of remodeling, construction, and landscaping for five years. *Id.* at 65:22–66:12. Meza testified that an executive in Denco's main office gave Meza the settlement agreements to give out to employees. ECF No. 98 at 68:15–69:10. Meza understood that Denco employees were generally aware of this lawsuit "[b]ecause they were talking about it among themselves and someone told them that they were . . . suing and someone was in charge of speaking with everyone so that they could join." ECF No. 98 at 79:22–80:12. When Meza gave the employees the document, he explained "what the document was and what it meant and what the money was." *Id.* at 80:6–12, 81:15–20. Meza "gave them the agreement first that they should read it and that if they had questions they should go to a notary or somebody who could explain the document to them." *Id.* at 72:2–4. He did not tell employees that they needed to sign the document, nor that they would lose their

job if they did not sign. *Id.* at 80:13-18, 81:1-4. Meza testified that "a lot" of the people

who received the document "understand and read English, but there are other people

who don't , and they don't speak it." *Id.* at 72:11–22. Many employees who received the

document used an app on their phone to translate the document. *Id.* at 80:19–25. Meza

estimated that 85 percent of the Denco employees that received the document signed it

immediately, while "the other people took them off to be able to read and understand

them better." *Id.* at 73:12–17. Meza testified that all of the employees who received the

settlement agreement chose to sign it and received payment. *Id.* at 81:5–9. Meza

testified that he gave Denco employees envelopes containing checks for $500. ECF No.

98 at 78:10–20.

Meza did not speak to employee Alfredo Rios about the possibility that Denco

may owe him unpaid overtime wages when presenting him with the document. *Id.* at

73:3–11. With respect to employee Gerardo Vidal, Meza testified that this employee

received a check for $8,000 while most others only received $500 because "he said that

he had a lawyer, but he also said that if he were paid that amount, he would drop the

lawsuit." *Id.* at 74:3–9; Pls.' Hr'g Ex. 2 at 3.

The testimony of Meza and Suarez are in conflict with respect to the settlement

and payments made to Suarez. Meza testifies that he did not tell Suarez that the check

was an IRS refund. ECF No. 98 at 81:21–25.

### c. Post-Hearing Submissions

As the evidentiary hearing concluded, the Court noted that there was still a lack

of clarity as to "exactly what's at issue and what the relief is." ECF No. 98 at 97:10–16.

During the hearing, Plaintiffs' counsel had requested with respect to the potential class

members who signed the release and received $500 checks "that the Court find the releases invalid, provide a notice to the potential class informing them that the release is invalid, informing them of this lawsuit, and informing them of the right to join this lawsuit." ECF No. 98 at 16:8–24. The parties later each filed proposed findings of fact and conclusions of law on March 26 and April 10, 2025. ECF Nos. 104-1 & 114.[8] Plaintiffs' counsel requests that the Court "invalidat[e] the waivers," "send[] the FLSA Collective/Potential Class a corrective notice of the lawsuit," and order that "the Denco Defendants should . . . be prohibited from discussions with the potential class." ECF No. 104-1 at 15.

The Denco Defendants argue that Plaintiffs Perez, Orantes, and Suarez do not have standing to challenge the validity of the 63 other agreements that Denco entered into with other current and former employees. ECF No. 114 at 17. This is because they are not parties to the contracts, and because Fed. R. Civ. P. 23(e) does not apply where a class has not yet been certified. *Id.* at 19.

**d. Ruling**

### i. Purported Settlement Agreements of Fuentes, Vidal, Orantes, Perez, and Suarez are Not at Issue

Plaintiffs' original motion specifically addressed the prospect of current Denco employees being given a $500 settlement and potentially being threatened with firing if they did not agree to settle. ECF No. 59. However, throughout the briefing of this motion, Plaintiffs' counsel has at times appeared to ask the Court to invalidate the

---

[8] Plaintiffs' counsel's "proposed findings of fact" makes new allegations and references a number of documents not introduced into evidence at the hearing. The Court must disregard these references and related factual allegations and rely only upon the documentary and testimonial evidence properly introduced at the hearing.

settlement agreements of the four individuals who received amounts greater than $500—Fuentes ($15,000), Vidal ($8,000), Orantes ($12,000), and Perez ($12,000). *See e.g.*, ECF No. 104-1 at 11 (arguing that Perez and Orantes settlement agreements should not be enforced); ECF No. 98 at 76:5–19 (questions posed to Meza at the evidentiary hearing regarding Fuentes settlement agreement); 74:3–9 (questions posed to Meza at the evidentiary hearing regarding Vidal settlement agreement).

The Court rules that agreements signed by Fuentes, Vidal, Orantes, and Perez are not at issue with respect to this motion, ECF No. 59. Fuentes has withdrawn from this lawsuit. ECF No. 12. These agreements were for substantially greater sums of money than $500, and were not described in the original motion. *See* Pls.' Hr'g Ex. 2. Additionally, the agreements appear to have been made after these individuals consulted with an attorney. *See* ECF No. 114 at 4 (undisputed that Perez was working with an attorney no later than September 2024, months before the $12,000 payment was made); ECF No. 98 at 73:22–74:9 (Meza's testimony that Vidal received $8,000 in part because "he said that he had a lawyer"); ECF No. 1 (Plaintiff filed this lawsuit on behalf of Orantes in October 2024, months before the $12,000 settlement payment was made). The Court declines to make any determination about the enforceability of these agreements at this time.

The Court also finds that the Suarez settlement agreement is not at issue with respect to this motion, ECF No. 59. Plaintiffs' counsel presented evidence at the hearing regarding the circumstances surrounding Suarez's signing of the settlement agreement, and later argued in post-hearing briefing that "the Suarez agreement is not enforceable because it was not the result of a bona fide dispute." ECF No. 104-1 at 12. However,

Plaintiffs' counsel explicitly indicated at the hearing that he was *not* requesting to invalidate the settlement agreements of the named Plaintiffs (then, Perez, Orantes, and Suarez). ECF No. 98 at 36:1–37:2 (Defense counsel: "I mean, I guess just a point of clarification. It's my understanding that we're not trying to invalidate the named plaintiff's settlement agreements in this hearing. Is that correct?" Court: "Yeah, if you can clarify." Plaintiffs' counsel: "Yeah, that's correct. The point of the line of questioning was more to show the method in which Denco is getting both employees and former employees to sign agreements, their methods."). The subject matter of this motion has shifted over the course of briefing, at hearing, and post-hearing briefing, and the Court must credit Plaintiffs' counsel's explicit statement at the hearing that the Suarez settlement agreement is not at issue with respect to this motion.

>        ii.   **The 61 Settlement Agreements for $500 with Non-Plaintiff Current and Former Denco Employees are Presumptively Invalid**

With respect to the instant motion, what is left for the Court to consider are the 61 settlement agreements for $500 signed by current and former Denco employees—both the enforceability of the releases, and whether any remedial measures are appropriate.

Plaintiffs' counsel first argues that, following *Lynn's Food Stores, Inc. v. U.S. By & Through U.S. Department of Labor, Employment Standards Administration, Wage & Hour Division*, the Court must review and approve the settlement agreements in order for them to be enforceable. 679 F.2d 1350, 1355 (11th Cir. 1982). In *Lynn's Foods*, the Department of Labor ("DOL") conducted an investigation, found that an employer's wage and overtime policies violated the FLSA, and concluded the employer was liable to its employees for back wages. *Id.* at 1352. After the employer could not reach a settlement with the DOL, it attempted to settle with its employees directly by offering

them $1,000, to be divided among them on a pro rata basis. *Id.* Fourteen employees

accepted the offer and signed agreements in exchange for a waiver of any FLSA

claims. *Id.* The employer then brought suit seeking judicial approval of the settlement.

*Id.* at 1352. The Eleventh Circuit held that

> [o]ther than a section 216(c) payment supervised by the [DOL], there is only
> one context in which compromises of FLSA back wage or liquidated
> damage claims may be allowed: a stipulated judgment entered by a court
> which has determined that a settlement proposed by an employer and
> employees, in a suit brought by the employees under the FLSA, is a fair and
> reasonable resolution of a bona fide dispute over FLSA provisions.

*Id.* at 1355. The court ultimately declined to approve the settlement agreements and

held that they violated the FLSA, explaining:

> Settlements may be permissible in the context of a suit brought by
> employees under the FLSA for back wages because initiation of the action
> by the employees provides some assurance of an adversarial context. The
> employees are likely to be represented by an attorney who can protect their
> rights under the statute. Thus, when the parties submit a settlement to the
> court for approval, the settlement is more likely to reflect a reasonable
> compromise of disputed issues than a mere waiver of statutory rights
> brought about by an employer's overreaching. If a settlement in an
> employee FLSA suit does reflect a reasonable compromise over issues,
> such as FLSA coverage or computation of back wages, that are actually in
> dispute; we allow the district court to approve the settlement in order to
> promote the policy of encouraging settlement of litigation. But to approve an
> "agreement" between an employer and employees outside of the
> adversarial context of a lawsuit brought by the employees would be in clear
> derogation of the letter and spirit of the FLSA.

> The facts of this case illustrate clearly why this is so. Lynn's employees had
> not brought suit against Lynn's for back wages. Indeed, the employees
> seemed unaware that the Department of Labor had determined that Lynn's
> owed them back wages under the FLSA, or that they had any rights at all
> under the statute. There is no evidence that any of the employees consulted
> an attorney before signing the agreements. Some of the employees who
> signed the agreement could not speak English.

*Id.* at 1354 (footnotes and internal citations omitted).

The Tenth Circuit has not held that judicial approval of FLSA settlements is required. Courts in this district have repeatedly observed that "nothing in the text of the FLSA expressly requires court review and approval of settlements," and "the *Lynn's Food*[ ] requirement for judicial approval of voluntary settlements was driven by its facts—the employer overreached the employees in inducing them to settle unasserted and unevaluated claims for a small amount of money." *Martinez v. Back Bone Bullies Ltd*, No. 21-cv-01245-MEH, 2022 WL 782782, at *7–8 (D. Colo. Mar. 15, 2022) (quoting *Ruiz v. Act Fast Delivery of Colo., Inc.*, No. 14-cv-00870-MSK-NYW, 2017 WL 11545275, at * 1–2 (D. Colo. Jan. 9, 2017)). The Court notes that the description: "the employer overreached the employees in inducing them to settle unasserted and unevaluated claims for a small amount of money," fits the current circumstances as well.

Acknowledging that the Tenth Circuit has not held that judicial approval of FLSA settlements is required, Plaintiffs make the secondary argument that even if the Court does not find that it *must* review FLSA settlements, the Court should find that it *may* review them, and should exercise its discretion to review the settlement agreement in this case due to the circumstances under which the document was signed.[9] Both sides

---

[9] Plaintiffs' counsel argues that "many Judges in the District of Colorado have required the parties to provide the settlement agreement for Court approval" in FLSA cases. ECF No. 104-1 at 8. But Plaintiffs' counsel cites three cases that do not support this assertion. *See Prim v. Ensign United States Drilling Inc.,* No. 15-cv-02156-PAB-KMT, 2020 WL 4539630 (D. Colo. Aug. 6, 2020) (evaluating *unopposed* motion to approve settlement agreement); *Thompson v. Qwest Corp.*, No. 17-cv-01745-WJM-KMT, 2018 WL 2183988, at *2 (D. Colo. May 11, 2018) ("Whether *Lynn's Food* was correctly decided is certainly open to question. But no party here has raised that question and the Court sees no reason to explore it *sua sponte* at this time. Accordingly, the Court will go forward *under the assumption that it must approve the Proposed Settlement*.") (emphasis added) (citation omitted); *Baker v. Vail Resorts Mgmt. Co.*, No. 13-cv-01649-PAB-CBS, 2014 WL 700096, at *1 (D. Colo. Feb. 24, 2014) (evaluating a *joint* motion for approval of settlement agreement). None of these cases evaluate

acknowledge that the Court *may* decide to review FLSA settlements under certain circumstances. *See Martinez*, 2022 WL 782782, at *10 ("[W]hile there is disagreement over whether FLSA settlements must be approved by the Court, there does not appear to be disagreement at this time over whether FLSA settlements may be approved by the Court.") (quoting *Slaughter v. Sykes Enters., Inc.*, No. 17-cv-02028-KLM, 2019 WL 529512, at *1–6 (D. Colo. Feb. 11, 2019)). "Before approving an FLSA settlement, a court must find that: (1) the agreement is the result of a bona fide dispute; (2) the proposed settlement is fair and reasonable to all parties involved; and (3) the proposed settlement contains a reasonable award of attorneys' fees and costs." *Prim*, 2020 WL 4539630, at *3.[10]

While Plaintiffs' counsel urges the Court to review the settlement agreements and determine that they are invalid, defense counsel asks the Court "to adopt the requirement in *Ruiz* and [*Fails v. Pathway Leasing LLC*, No. 18-cv-00308, 2018 WL 6046428 (D. Colo. Nov. 19, 2018)] that the aggrieved employee be the one to challenge an FLSA agreement because such a requirement comports with fundamental principles of standing." ECF No. 114 at 18. In *Ruiz,* the court explained:

> In modern jurisprudence, only a narrow range of settlements require court approval. Among them are settlements in Rule 23 class actions and settlements involving infants or incompetent persons. In such circumstances, judicial review of compromises is necessary because the parties affected – the class members or the incompetent persons – are not

---

whether court approval of an FLSA settlement is required, but instead apply the *Lynn's Foods* factors in approving parties' joint motions for approval of an FLSA settlement.

[10] Plaintiff additionally argues that "[t]he factors the Court examines in determining whether a FLSA settlement should be approved demonstrates that the settlement agreements here should be deemed invalid and so Plaintiffs have standing." ECF No. 104-1 at 10. But whether a settlement agreement is fair, reasonable, and/or enforceable is a different question from whether Plaintiffs' counsel has standing to question the settlement agreements signed by non-party Denco employees.

directly before the court nor have they necessarily participated in the decision to settle.

The FLSA action, however, does not necessarily reflect either circumstance. The peculiar opt-in nature of an FLSA collective action anticipates that all of those parties who settle are actively participating and are represented by counsel. This Court sees no reason why the public policies underlying the FLSA are any more important than those underlying Title VII, the ADA, or other statutes designed to protect employees against discrimination or oppression, all of which may be effectively compromised by the affected employees in a private settlement without requiring court review or approval.

2017 WL 11545275, at *2–3. With respect to employers who may "resort to subterfuge, misdirection, or coercion to improperly induce employees into surrendering their FLSA rights," *Ruiz* decided that

the correct solution to address a narrow problem is not an overbroad rule requiring all FLSA settlements to receive judicial review and approval. Rather, the appropriate remedy to cure such misconduct is the same remedy used in literally every other context where a settlement is claimed to be coercive, deceptive, or overreaching: upon a proper showing by the employee, the court may set aside the settlement contract and restore the employee's right to seek his or her FLSA remedies directly.

*Id.* at *3; *see also Fails*, 2018 WL 6046428, at *3 (holding that while "judicial review of bona fide FLSA disputes is not required," "review of FLSA settlements is still available in certain circumstances," such as "where a party alleges that an agreement does not actually pertain to a bona fide dispute—which is to say that there is evidence of malfeasance or overreaching in obtaining a settlement agreement").

The Court, following *Ruiz* and *Fails*, finds it is not required to review the 61 $500 settlement agreements, but that it may do so if the settlement agreements are "claimed to be coercive, deceptive, or overreaching," *Ruiz*, 2017 WL 11545275, at *3. The Court has taken notice of the following evidence regarding the 61 $500 settlement agreements:

- The operative pleading in this case was amended to include class action allegations on December 18, 2024, and all of these agreements were signed, and checks issued, from December 24, 2024 through December 31, 2024. *See generally* Pls.' Hr'g Ex. 2.

- Meza provided these agreements to the 61 employees. Although the vast majority of these employees spoke only Spanish, the agreements were only provided in English.

- The agreements did not reference this lawsuit or the fact that any litigation was ongoing, and there was no description of the potential value of the claims the employees were foregoing in exchange for the $500 payment.

- Meza explained "what the document was and what it meant and what the money was." ECF No. 98 at 80:6–12, 81:15–20. Meza "gave them the agreement first that they should read it and that if they had questions they should go to a notary or somebody who could explain the document to them." *Id.* at 72:2–4.

- Meza estimated that 85 percent of the Denco employees that received the document signed it immediately, while "the other people took them off to be able to read and understand them better." *Id.* at 73:12–17.

- Ultimately, all employees who received the $500 settlement agreement chose to sign it and received checks for $500. *Id.* at 78:10–20, 81:5–9.

- Meza believed that the employees "were talking about [the lawsuit] among themselves and someone told them that they were . . . suing and someone was in charge of speaking with everyone so that they could join." *Id.* at 79:22–80:12.

- There was no evidence presented that the employees, in signing away their FLSA rights, knew how much back wages or overtime they would have been entitled to under the FLSA.

- The fact that employees who had counsel received payments orders of magnitude larger than the unrepresented employees for giving up their FLSA claims is prima facie evidence that Denco was trying to, and did take advantage, of their unrepresented employees to buy themselves out of a potential lawsuit on the cheap.

Court is extremely troubled by the fact that Denco handed out form agreements to its employees—which did not reference this lawsuit—mere days after class action claims arose in this case. All of the above facts lead to the conclusion that Denco was resorting to "subterfuge, misdirection, or coercion to improperly induce employees into surrendering their FLSA rights" for pennies on the dollar. *Ruiz*, 201 WL 1154275, at *3. The Court therefore finds that these agreements to be presumptively invalid.

However, Plaintiffs' counsel requests the remedy of formally invalidating these contracts now, before many (or all) of these employees have joined the suit as opt-ins. In addition, the Court has not yet determined whether preliminary certification under Rule 23 is warranted. As of now, Plaintiffs' counsel has not presented any evidence as to whether any of these 61 individuals wishes to undo the settlement agreement.[11]

---

[11] Plaintiffs' counsel presented conflicting testimony from Suarez with respect to Meza's communications about the content of the settlement agreement. But this does not provide any information about the content of Meza's communications with the other 61 Denco employees.

Accordingly, it is hereby ORDERED that Plaintiffs' request for retrospective relief—invalidation of the 61 settlement agreements for $500—is DENIED without prejudice at this time. In the current posture of this case as an FLSA collective action, conditionally certified via the order that the Court enters simultaneously with this Order, these individuals may opt-in to this lawsuit. In so doing, they will be able to individually request that the agreements be invalidated. Of course, they may be required to return the $500 they received or have the $500 offset any award they receive in this case. But they have not yet done so, and the Court is not yet prepared to definitively invalidate the settlement agreements until the employees are formally in the case. If, as described below, a corrective notice is sent out to the putative collective of Denco employees, and these employees opt in to the collective, the Court would address the release agreements of the individual opt-ins at that time.

### iii.  Managing Communications with Potential Collective and Class Members

Plaintiffs' counsel also argues that the Court should exercise its "broad discretion to manage communications in class actions" and issue a corrective notice to these sixty-one potential class members. ECF No. 59 at 4 (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100–01 (1981)). Plaintiffs' counsel primarily argues that the purported settlement agreement is misleading because it does not provide notice of this case. ECF No. 59 at 5 (citing *Williams v. Sake Hibachi Sushi & Bar, Inc.*, No. 3:18-cv-0517-D, 2018 WL 4539114, at *3 (N.D. Tex. Sept. 21, 2018)). In response, Defendants argue that although the operative complaint includes class allegations, no class has been certified, and, indeed, Plaintiffs have not yet moved to certify a class pursuant to Rule 23. Therefore, they argue that Rule 23(e), which concerns the required approval

procedures for a settlement, voluntary dismissal, and compromise in a class action, does not apply.

As an initial matter, the Court agrees with the Denco Defendants that Rule 23(e) does not apply to settlement agreements that occur before class certification and is therefore inapplicable here. Rule 23(e) sets out applicable procedures for obtaining settlement, voluntary dismissal, and compromise in a class action, and provides that "[t]he claims, issues, or defenses *of a certified class*—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised *only with the court's approval*." Fed. R. Civ. P. 23(e) (emphasis added). "Thus, settlements or voluntary dismissals that occur before class certification are outside the scope of subdivision (e)." 7B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1797 (3d ed. 2025).

However, the Denco Defendants do not substantively contend with Rule 23(d), which conveys additional authority to a court with respect to imposing limitations on communications between the parties in a class action. It provides:

In conducting an action under this rule, the court may issue orders that:

A. determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

B. require—to protect class members and fairly conduct the action— giving appropriate notice to some or all class members of: (i) any step in the action; (ii) the proposed extent of the judgment; or (iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

C. impose conditions on the representative parties or on intervenors;

    D.  require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

    E.  deal with similar procedural matters.

Fed. R. Civ. P. 23(d)(1). "[T]he rule does not limit the court either with regard to when or how subdivision (d) may be invoked and applied." 7B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1791 (3d ed. 2025). "Rule 23(d) authorizes the court to regulate communications with potential class members, even before certification." *Id.* (quoting Manual for Complex Litigation (Fourth) § 21.12, at 247 (2004)); *see also Bonanno v. Quiznos Masters LLC*, No. 06-cv-02358-WYD-BNB, 2007 WL 1089779, at *3 (D. Colo. Apr. 10, 2007) ("[A] court's power to restrict communications between parties and potential class members applies even before a class is certified").

    The Tenth Circuit has recognized that "courts can use Rule 23(d) to restrict inappropriate communications from counsel to putative class members." *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1204 n.3 (10th Cir. 2016). As the Supreme Court has recognized,

> Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. But this discretion is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules.

*Gulf Oil*, 452 U.S. at 100.

    The Manual for Complex Litigation provides the following regarding pre-certification communications with a proposed class.

> Direct communications with class members . . . whether by plaintiffs or defendants, can lead to abuse. For example, defendants might attempt to

> obtain releases from class members without informing them that a proposed
> class action complaint has been filed. . . . In appropriate cases, courts have
> informed counsel that communications during an ongoing business
> relationship, including individual releases or waivers, must be accompanied
> by notification to the members of the proposed class that the litigation is
> pending.

Manual for Complex Litigation § 21.12 (4th ed. 2024) (footnotes omitted). "If class

members have received inaccurate precertification communications, the judge can take

action to cure the miscommunication and to prevent similar problems in the future." *Id.*

(footnote omitted). "Defendants and their counsel generally may communicate with

potential class members in the ordinary course of business, including discussing

settlement before certification, but may not give false, misleading, or intimidating

information, conceal material information, or attempt to influence the decision about

whether to request exclusion from a class certified under Rule 23(b)(3)." *Id.* (footnote

omitted).

"[A]n order limiting communications between parties and potential class members

should be based on a clear record and specific findings that reflect a weighing of the

need for a limitation and the potential interference with the rights of the parties." *Dolan*

*v. Project Const. Corp.*, 725 F.2d 1263, 1268 (10th Cir. 1984) (quoting *Gulf Oil*, 452

U.S. at 101), *abrogated by Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989);

*see also Zinser v. Cont'l Grain Co.*, 660 F.2d 754, 762 (10th Cir. 1981) (reversing trial

court protective order which "requiring the named parties and counsel to obtain court

permission before contacting members of the class"). "To determine when to restrict

communication with putative class members, courts evaluate the evidence of actual or

threatened abuse by the party sought to be restrained." *Stransky v. HealthONE of*

*Denver, Inc.*, 929 F. Supp. 2d 1100, 1105 (D. Colo. 2013) (citation omitted). "[S]uch a

weighing—identifying the potential abuses being addressed—should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Gulf Oil*, 452 U.S. at 102. "Restrictive orders have been issued for communications that are misleading to class members regarding the litigation, communications that misrepresent the status or effect of the pending action, communications that coerce prospective class members into excluding themselves from the litigation, and communications that undermine cooperation with or confidence in class counsel." *Bass v. Pjcomn Acquisition Corp.*, No. 09-cv-01614-REB-MEH, 2011 WL 902022, at *4 (D. Colo. Mar. 14, 2011).

The instant case involves both class and collective claims. In class action cases, potential class members may choose to opt out of the action. *See* Fed. R. Civ. P. 23(c)(3). In contrast, FLSA collective actions require potential collective members to opt in to the action in writing to become members of the collective. *See Stransky*, 929 F. Supp. 2d at 1105 (citing 29 U.S.C. § 216(b)). "As in a Rule 23 class action, a court retains authority in a Section 216 collective action to govern the conduct of counsel and parties." *Id.* (citing *Hoffmann–La Roche, Inc. v. Sperling*, 493 U.S. 165, 170–72 (1989)). "[I]n Section 216 cases, 'there is no prohibition against pre-'opt-in' communication with a [Section] 216(b) potential plaintiff, unless the communication undermines or contradicts the Court's notice,' or is misleading, coercive, or otherwise improper." *Id.* at 1105–06.

In this case, there is evidence that the Denco Defendants approached at least 61 current or former Denco employees mere days after class action claims were filed, presented these individuals with settlement agreements (not in their native language) that did not mention this lawsuit or the fact that any litigation was pending, and offered

each person $500 to settle their claims against Denco—without describing the nature of the potential claims or their value. Every single person took the offer. The Court concludes this type of communication was improper and now requires correction under Rule 23(d). *See id.* at 1106 (ordering remedial measures after defendants "held mandatory staff meetings discussing the lawsuit in which Defendant misled putative class members about the legal proceeding, and attempted to coerce and intimidate them into declining to opt-in"); *Williams*, 2018 WL 4539114, at *3 ("[T]he settlement agreements neglect to mention the instant case by name or to give the putative class members any other information that would allow them to make an informed decision to waive their rights. Absent evidence to the contrary, these failures, in addition to the failure to provide sufficient information regarding damages, lead to the conclusion that the settlement agreements constitute misleading communications."); *Bonanno*, 2007 WL 1089779, at *3 (finding evidence of "possible interference" in franchisor defendants' communications with putative class members where defendants sent letters to putative class member franchisees after the lawsuit was filed to ask them to sign releases). "Obtaining opt-out forms ex parte at this stage of the litigation—before a class has been certified by the Court—unquestionably frustrates the purposes of Rule 23." *Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 518 (N.D. Cal. 2010) (finding that meetings between defendant employer and putative class member employees were "inherently coercive" where defendants "presented opt-out forms to workers during required, one-on-one meetings with managers during work hours and at the workplace," defendants "failed to provide copies of the opt-out forms to workers to take away with them, or to

provide a written translation of the form in the workers' primary language," and "a substantial number" of current workers signed the releases).

The Denco Defendants cite *Clark v. Hyatt Hotels Corp.*, No. 20-cv-01236-RM-SKC, 2020 WL 6870599 (D. Colo. Oct. 30, 2020), and argue that because "there was no showing that defendant had engaged in improper conduct that undermined the purposes of Rule 23," no curative action should be required. The Court disagrees and finds *Clark* to be factually dissimilar from the present case. In *Clark*, plaintiffs sought the issuance of a notice to the putative class (hundreds of hotel guests) "whom Plaintiffs allege were likely exposed to dangerous levels of carbon monoxide." *Id.* at *2. The court denied this request because there was no evidence of improper conduct on the part of defendants. *Id.* In the instant case, the Court does have sufficient evidence to conclude that the Denco Defendants' outreach to the putative class and collective members was improper and requires a curative notice.

"To prevent and correct any potential interference by the least restrictive means necessary," *see Bonnano*, 2007 WL 1089779, at *3, the Court finds that a corrective notice should be sent to the 61 individuals who signed $500 settlement agreements. The notice shall be in English and Spanish, shall include a statement describing this lawsuit, shall include Plaintiffs' counsel's contact information. The notice shall further include a statement that these individuals may be able to join this lawsuit, and that any waivers of rights they have signed may be deemed invalid by the Court. Given that the Court, simultaneous with this Order, is granting Plaintiff's motion to preliminarily certify an FLSA collective, it makes the most sense for the corrective aspects of this notice be

combined with the notice being sent to the collective to inform the employees of this litigation and their right to opt-in.

Plaintiffs' counsel and defense counsel shall jointly draft the proposed notice that complies with the order on conditional certification and includes the corrective language. On or before September 22, 2025, the proposed notice shall be submitted to the Court for approval. If the parties cannot agree upon the language of the notice, the parties shall each submit their own versions on that date.

## III.    CONCLUSION

For the reasons set forth above, it is hereby **ORDERED** that Plaintiffs Perez and Orantes' Motion for a Protective Order and Corrective Notice to the Potential FLSA Collective and Class, ECF No. 59 is **GRANTED IN PART** and **DENIED IN PART**.

Dated at Denver, Colorado this 12th day of September, 2025.

N. Reid Neureiter
United States Magistrate Judge