IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-02766-RMR-NRN

WILMAR PEREZ,
RUBY ORANTES,
EDGAR SUAREZ ACEROS,
ALEXIS CALDERON, and
GOJHAN SIERRA,

      Plaintiffs,

v.

DENCO CONSTRUCTION LLC d/b/a DENCO,
ROA CONSTRUCTION LLC,
ABC COMPANIES 1-10 (names fictitious),
BRUCE RAHMANI,
YESSICA ROA, and
JOHN DOES 1-10 (names fictitious) individually,

      Defendants.

---

**REPORT AND RECOMMENDATION ON
DEFENDANT DENCO CONSTRUCTION LLC'S MOTION TO ENFORCE
SETTLEMENT AGREEMENTS (ECF No. 112)**

---

**N. REID NEUREITER
United States Magistrate Judge**

      This case is before the Court pursuant to an Order issued by Judge Regina M.

Rodriguez, ECF No. 113, referring Defendant Denco Construction LLC's ("Defendant")

Motion to Enforce Settlement Agreements, filed April 3, 2025. ECF No. 112. Plaintiffs

Wilmar Perez, Ruby Orantes, and Edgar Suarez Aceros ("Plaintiffs") filed a response on

April 24, 2025. ECF No. 118. Defendant filed a reply on May 8, 2025. ECF No. 134. The

Court heard oral argument on May 28, 2025. ECF No. 135. The Court has taken judicial

notice of the case file and considered the applicable federal and state statutes and case

law. As set forth below, it is hereby **RECOMMENDED** that Defendant's Motion to
Enforce Settlement Agreements, ECF No. 112, be **DENIED.**

## I.    BACKGROUND[1]

### a.  Procedural History[2]

Plaintiffs Perez, Orantes, and Suarez were formerly employed by Defendant as
construction workers. Plaintiffs allege that Defendant, acting in concert with Defendants
Roa Construction LLC and Yessica Roa, violated the Fair Labor Standards Act
("FLSA"), 29 U.S.C. §§ 201 et seq., the Colorado Wage Act ("CWA"), Colo. Rev. Stat.
§§ 8-4-101, et seq., and the Colorado Overtime and Minimum Pay Standards Order
("COMPS"), 7 Colo. Code Regs. § 1103-1, by failing to pay their employees one and
one-half times each employee's regular rate of pay for each hour worked beyond 40
each workweek. Plaintiffs claim that Defendant required workers to use two separate
timecards. Defendant would pay employees for the first 40 hours worked. Then, rather
than being paid overtime for additional hours worked, employees would be paid straight
time by Roa Construction LLC, a shell company controlled and funded by Defendant. In
some cases, Defendant had Roa Construction LLC pay their employees for all hours
worked, even though they were in all respects employees of Defendant.

Plaintiffs Perez and Orantes were two of the four named Plaintiffs in the original
Collective Action Complaint that was filed on October 7, 2024. The pleading was
amended to include class action allegations on December 18, 2024. The First Amended
Class and Collective Action Complaint for Unpaid Wages, ECF No. 25, brought a

---

[1] Any citations to docketed materials are to the page number in the CM/ECF header,
which sometimes differs from a document's internal pagination.
[2] The following facts are drawn from Plaintiffs' Third Amended Complaint, ECF No. 117.

collective action FLSA claim and new class action claims under the CWA and COMPS against Defendant.

On February 17, 2025, Plaintiffs' counsel filed a Second Amended Complaint on behalf of Perez, Orantes, and new Plaintiff Suarez, bringing the same class and collective action claims against Denco Construction LLC, and new Defendants Roa Construction Group LLC and Yessica Roa.

On April 23, 2025, the Court granted an unopposed motion for leave to file a Third Amended Complaint, and Plaintiffs' counsel filed the now-operative Third Amended Complaint on behalf of Perez, Orantes, Suarez, and new Plaintiffs Alexis Calderon and Gojhan Sierra. ECF No. 117. On May 7, 2025, Plaintiffs filed a third motion for conditional certification of the FLSA collective action, ECF No. 131, which this Court granted in an Order dated September 12, 2025. ECF No. 161.

### b. Private Settlement Agreements

### i. Plaintiffs Perez and Orantes

Perez worked for Defendant as a laborer and an electrician from September 2019 through June 2024. ECF No. 98 at 29:21–30:4. In September 2024, a few months after Perez's employment with Defendant ended, Plaintiffs' counsel sent a demand letter to Defendant on behalf of Perez. ECF No. 114 at 4. Within 14 days, Perez received a check from Defendant for $16,572.27.[3] Defs.' Mar. 11, 2025, Hr'g Ex. 1. Perez did not sign anything in exchange for receiving this check. ECF No. 98 at 40:13–15. Perez cashed the check and paid counsel $5,523.00. ECF No. 98 at 39:19–40:25;

---

[3] The gross amount paid to Perez was $28,861.00, which came out to 16,572.27 after tax. ECF No. 98 at 17:21–25.

ECF No. 100-5. It is defense counsel's position that this payment was made pursuant to the CWA, which provides that an employer may resolve a CWA claim by making an unconditional tender of funds within 14 days of a demand. ECF No. 98 at 17:13–20. Perez testified that agents of Defendant called Perez on the phone "several times" to attempt to "give [him] a settlement" in the form of money and a promise to give him his job back. ECF No. 98 at 33:19–34:12.

On February 13, 2025, Perez signed a document (in English and Spanish) and upon signing, received a check for $12,000, with "legal settlement" written in the memo line. ECF No. 87-3. Perez was represented by counsel at the time but did not consult with his counsel prior to signing the agreement. Perez testified that Defendant encouraged him to settle directly with them and not use his lawyer. ECF No. 98 at 35:1–4 ("They always told me that the money that they were giving to the lawyers would not be given to me and it would be better for me to settle with them so that I wouldn't lose my money.").

Similarly, Orantes received payment of $11,305.00 from Defendant on October 25, 2024. Orantes did not sign anything in exchange for this amount. Later, on February 13, 2025, Orantes signed a document (in English and Spanish) and received a check for $12,000. ECF No. 112-5. Out of this total sum of $23,305.00, no portion was paid to counsel. ECF No. 118 at 8. There was no demand letter sent on behalf of Orantes, only this lawsuit. ECF No. 152 at 9.

The Court summarizes the relevant portions of the settlement agreements as follows. The documents are titled "Confidential Settlement Agreement, Release, and Covenant Not to Sue." The agreements do not reference this lawsuit. *See* ECF No. 112-

3; 112-5. The agreements are three pages long, single-spaced. Regarding the purpose

of the agreement, the document states:

> This Agreement is entered into by the Parties to resolve any disputes that
> the Parties may have that in any manner relate to, arise out of, or involve
> any aspect of Employee's employment with the Company, including, but not
> limited to, any alleged owed and unpaid overtime compensation.

*Id.* Regarding the "settlement payment," the document states:

> In consideration for Employee's entry into this Agreement and the resulting
> acceptance of the terms and obligations of this Agreement, including but
> not limited to the waiver and release of all claims against the Company, as
> is described in paragraph 7 below, and subject to the other provisions of
> this Agreement, the Company shall pay Employee the total gross sum of
> $12,000, less all applicable withholdings and deductions (the "Settlement
> Payment").

*Id.* Regarding the employee's "release of claims," the document states:

> In exchange for the Settlement Payment and in consideration of the
> agreements set forth in this Agreement, Employee hereby releases and
> discharges the Company and any successor, predecessor, parent, affiliate,
> or subsidiary company of the Company, their present and former officers,
> directors, employees, agents, representatives, legal representatives,
> accountants, attorneys, insurers, reinsurers, successors, and assigns
> (collectively "Released Parties"), from all claims, demands, and actions of
> any nature, known or unknown, that Employee may have against Released
> Parties that in any manner relate to, arise out of, or involve any aspect of
> Employee's employment with the Company, including but not limited to, any
> rights or claims under [numerous federal and state laws and regulations
> including the FLSA, CWA, and COMPS]. . . . This release and waiver further
> include any and all claims concerning attorney fees, costs, and any and all
> other expenses related to the claims released in this Agreement.

*Id.* The document also states that "Employee acknowledges that he or she has had the

opportunity to consult with an attorney prior to executing this Agreement." *Id.*

### ii. Plaintiff Suarez

Suarez worked for Defendant from November 2023 to July 2024 as an

electrician's assistant and in other roles. ECF No. 98 at 51:17–23. He signed an

agreement with Defendant on November 11, 2024 and received a check for $500 in December 2024. ECF Nos. 112-7 & 112-8. The agreement signed by Suarez was identical to the ones signed by Perez and Orantes save for the settlement amount. Unlike Perez and Orantes, however, Suarez only received an English version of the agreement. At an evidentiary hearing held on March 11, 2025 in connection with a related motion, the Court learned that Suarez speaks Spanish and does not understand English, other than the words "yes" and "no." ECF No. 98 at 51:11–16.

Also, in November 2024, Suarez did not have a job, and Mr. Meza, a supervisor at Defendant, helped him obtain a painting job from someone named Marta at "the Hotel Comfort." *Id.* at 53:22–54:11, 59:18–20. Suarez testified that Marta gave him an English language document to sign. *Id.* at 55:18–24. He signed the document on November 11, 2024, after "Marta . . . told me I had to sign the W-9 which is for taxes, and then this, which is for insurance." *Id.* at 55:10–13; *see also id*. at 58:10–13; (answering "No" to the question, "[W]ere you aware that the $500 check you deposited pertained to this lawsuit?"). The day that Suarez signed the document, he started working for Marta, who paid him for the work. *Id.* at 62:5–13. Suarez testified that Mr. Meza told him that the check "was a return of money from the IRS." *Id.* at 56:9–57:8; 61:1–4 ("[W]hen I talked to [Mr. Meza] he said it's okay that money is an IRS refund to Denco, and since you worked for Denco it's being divided among all of the people who worked for Denco."). Whether or not Suarez knowingly waived any rights when he signed a document in English and received only $500 for what he was told was a tax return is disputed. Mr. Meza, who has worked for Defendant full-time as a supervisor of remodeling,

construction, and landscaping for five years, testified that he did not tell Suarez that the check was an IRS refund. *Id.* at 81:21–25.

## II.    DISCUSSION

Defendant now moves to enforce the settlement agreements with Perez, Orantes, and Suarez. Relying on *Siribuor v. UHS of Denver, Inc.*, No. 12-cv-0077, 2012 WL 3590791, at *3 (D. Colo. Aug. 20, 2012), Defendant argues that in evaluating the validity of the settlement agreements, the Court should apply common law principles of contract law and that the relevant inquiry is whether there was "mutual assent to an exchange between competent parties . . . for legal consideration." ECF No. 112 at 5. Next, Defendant's motion cites to a string of cases, *see Abbott v. Kidder Peabody & Co.*, 42 F. Supp. 2d 1046, 1051 (D. Colo. 1999); *Jones v. Jones*, 188 P.2d 892, 893 (Colo. 1948); *Nichols v. Orr*, 166 P. 561, 563 (Colo. 1917), for the proposition that "it is neither unethical nor unlawful for represented parties to settle claims independently of their counsel." Further, with respect to the agreement with Suarez, Defendant's motion argues that a language barrier is not sufficient ground for invalidating the contract. Defendant cites to a case from the Northern District of California, *Rodriguez v. Sim*, No. C 08-3982 JL, 2009 WL 975457, at *6 (N.D. Cal. Apr. 10, 2009), where the court there refused to invalidate an arbitration agreement in English even though the plaintiff claimed she could not read English and did not understand the contract because "she had the opportunity to read the agreement (or have it explained or translated, if needed."[4]

---

[4] In coming to this conclusion, the court in *Rodriguez* found the plaintiff's allegations of fraud not credible. The court noted that the plaintiff in that case "ha[d] the written Arbitration Agreement at home, with her English-speaking son…who actually assisted

Plaintiffs argue that Defendant intentionally ignores the correct standard for evaluating a settlement agreement within the context of an FLSA claim. ECF No. 118 at 4. Plaintiffs argue that, following *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982), the Court must find "(1) the agreement is the result of a bona fide dispute; (2) the proposed settlement is fair and reasonable to all parties involved; and (3) the proposed settlement contains a reasonable award of attorneys' fees and costs." *Id.* (citing *Prim v. Ensign United States Drilling Inc.*, No. 15-cv-02156-PAB-KMT, 2020 WL 4539630, at *3 (D. Colo. Aug. 6, 2020)).

In its Reply, Defendant urges the Court to adopt the reasoning in *Ruiz v. Act Fast Delivery of Colorado, Inc.*, No. 14-cv-00870-MSK-NYW, 2017 WL 11545275 (D. Colo. Jan. 9, 2017), which challenged *Lynn's Food* and noted that "nothing in the text of the FLSA expressly requires court review and approval of settlements." *Id.* at * 1. In *Ruiz*, the court explained:

> In modern jurisprudence, only a narrow range of settlements require court approval. Among them are settlements in Rule 23 class actions and settlements involving infants or incompetent persons. In such circumstances, judicial review of compromises is necessary because the parties affected – the class members or the incompetent persons – are not directly before the court nor have they necessarily participated in the decision to settle.

> The FLSA action, however, does not necessarily reflect either circumstance. The peculiar opt-in nature of an FLSA collective action anticipates that all of those parties who settle are actively participating and are represented by counsel. This Court sees no reason why the public policies underlying the FLSA are any more important than those underlying Title VII, the ADA, or other statutes designed to protect employees against discrimination or oppression, all of which may be effectively compromised by the affected employees in a private settlement without requiring court review or approval.

---

her in filling out the certification of the Arbitration Agreement…. Consequently, she cannot void the contract" *Rodriguez*, 2009 WL 975457, at *6.

*Id.* at *2–3. With respect to employers who may "resort to subterfuge, misdirection, or coercion to improperly induce employees into surrendering their FLSA rights," *Ruiz* decided that

> the correct solution to address a narrow problem is not an overbroad rule requiring all FLSA settlements to receive judicial review and approval. Rather, the appropriate remedy to cure such misconduct is the same remedy used in literally every other context where a settlement is claimed to be coercive, deceptive, or overreaching: upon a proper showing by the employee, the court may set aside the settlement contract and restore the employee's right to seek his or her FLSA remedies directly.

*Id.* at *3; *see also Fails v. Pathway Leasing LLC*, No. 18-cv-00308-CMA-MJW, 2018 WL 6046428, at 3* (D. Colo. Nov. 19, 2018) (holding that while "judicial review of bona fide FLSA disputes is not required," "review of FLSA settlements is still available in certain circumstances," such as "where a party alleges that an agreement does not actually pertain to a bona fide dispute—which is to say that there is evidence of malfeasance or overreaching in obtaining a settlement agreement").

### a. Validity of Unsupervised Compromises of Rights under the FLSA

The question of whether parties could privately settle claims arising under the FLSA was first addressed by the Supreme Court in *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945). In that case, the bank employed O'Neil as a night watchman for two years but failed to pay him $423.16 in overtime wages. After O'Neil's employment ended, the bank offered him the full amount of overdue wages in exchange for a release all of his rights under the FLSA. There was no dispute as to the amount owed. O'Neil signed the release and accepted the check. Since this amount did not include any payment for liquidated damages, he subsequently sued the bank to recover liquidated damages under Section 16(b) of the FLSA. The Supreme Court invalidated the release

and held that signed waivers of claims for liquidated damages under the FLSA were unenforceable in the absence of a bona fide dispute between the parties as to liability. *O'Neil*, 324 U.S. at 704. The Court reasoned that "the same policy which forbids employee waiver of the minimum statutory rate because of inequality of bargaining power, prohibits these same employees from bargaining with their employer in determining whether so little damage was suffered that waiver of liquidated damage is called for." *Id.* at 708. The Court explained that the liquidated damages provision is not punitive in nature "but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." *Id.* at 707.

A year later, in *D.A. Schulte v. Gangi,* 328 U.S. 108 (1946), the Supreme Court expanded upon its holding in *O'Neil*. In *Gangi*, the employer disputed the employees' right to overtime pay. Under the threat of suit by its employees, the employer paid the overtime compensation in full in exchange for a release from the employees as to their rights under the FLSA. *Id.* at 111–12. After signing the releases, the employees subsequently sued to recover liquidated damages. The Supreme Court refused to enforce the agreements and held that "the remedy of liquidated damages cannot be bargained away by bona fide settlements of disputes over coverage." *Id.* at 114. While *O'Neil* and *Gangi* prohibited purely private compromises of claims under the FLSA where there is no bona fide dispute as to liability or where there is only a bona fide dispute as to coverage, they left unresolved the issue of under what circumstances private compromises of FLSA claims *may* be permitted.

This question was later addressed by the Eleventh Circuit in its seminal case, *Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350 (11th Cir. 1982). There, the Department of Labor ("DOL") found that Lynn's Food Stores, Inc. ("Lynn's") had violated the minimum wage, overtime, and record-keeping provisions of the FLSA and determined that Lynn's was liable to its employees for back wages and liquidated damages. After negotiations with DOL failed, Lynn's approached its employees directly to settle. Lynn's offered its employees $1,000.00 to be divided among them on a pro rata basis, in exchange for each employee's agreement to waive any claim for compensation arising under the FLSA. Around fourteen Lynn's employees signed the agreements and accepted pro rata shares of $1,000.00 in exchange for back wages which, according to the DOL, totaled over $10,000.00. *Lynn's Food Stores, Inc.*, 679 F.2d at 1352. None of the employees consulted with an attorney before signing the agreements and some of them could not speak English. *Id*. at 1354. The Eleventh Circuit ruled that there are only two contexts in which compromises of FLSA back wage or liquidated damages claims may be allowed: (1) a payment supervised by the Secretary of Labor pursuant to 29 U.S.C. § 216(c), and (2) a stipulated judgement entered by a court which has determined that the proposed settlement is a fair and reasonable resolution of a bona fide dispute. *Id*. at 1355. Thus, the Eleventh Circuit found that under no circumstances may parties privately settle claims under the FLSA without the supervision of either the DOL or a district court. In making its ruling, the Eleventh Circuit noted that "[t]he FLSA was enacted for the purpose of protecting workers from substandard wages and oppressive working hours" and that "there are often great inequalities in bargaining power between employers and employees." *Id.* at

1352 (internal citations omitted). Relying on *O'Neil* and *Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728 (1981), the Eleventh Circuit reasoned that "FLSA rights cannot be abridged by contract or otherwise waived because this would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate." *Id.* (internal quotation and citation omitted).[5]

Post *Lynn's Food*, courts and litigators across the country have assumed that court approval of FLSA settlements is required in every case, even where the settlement resolves a bona fide dispute as to the amount of compensation owed. Many courts in this District have likewise adopted the reasoning in *Lynn's Food* and applied its holding without much question. *See e.g. Baker v. Vail Resorts Mgmt. Co.*, No. 13-cv-01649-PAB-CBS, 2014 WL 700096 (D. Colo. Feb. 24, 2014); *Solis v. Top Brass, Inc*., No. 14-cv-00219-KMT, 2014 WL 4357486 (D. Colo. Sept. 3, 2014); *Cooper v. OFS 2 Deal 2, LLC*, No. 15-cv-01291-RM-NYW, 2016 WL 1071002 (D. Colo. Mar. 17, 2016).

---

[5] The Second Circuit followed the Eleventh Circuit in *Cheeks v. Freeport Pancake House, Inc.*, which held "[r]equiring judicial or DOL approval of such settlements is consistent with what both the Supreme Court and our Court have long recognized as the FLSA's underlying purpose…." 796 F.3d 199, 206 (2d Cir. 2015); *see also Martin v. Spring Break '83 Prods., L.L.C.*, 688 F.3d 247, 256 (5th Cir. 2012) ("The Settlement Agreement was a way to resolve a bona fide dispute as to the number of hours worked—not the rate at which Appellants would be paid for those hours—and though Appellants contend they are yet not satisfied, they received agreed-upon compensation for the disputed number of hours worked."). In *O'Connor v. U.S.*, 308 F.3d 1233 (Fed. Cir. 2002), the Federal Circuit relaxed the strict requirement of DOL or district court supervision only within the context of unionized federal employees. Other than the Second, Fifth, Eleventh, and Federal Circuit, other circuits have not ruled on the propriety of private settlements of FLSA claims. As Magistrate Judge Michael E. Hegarty summarized in *Martinez v. Back Bone Bullies Ltd*, No. 21-cv-01245-MEH, 2022 WL 782782 (D. Colo. Mar. 15, 2022), "[t]he Fourth, Seventh, Eighth, and Ninth Circuits have acknowledged, either in dicta or without substantive analysis, the requirement of court approval or DOL supervision for FLSA settlements. The First, Third, Sixth, Tenth, and District of Columbia Circuits have not expressly addressed the issue." *Id.* at *9.

The first case to seriously challenge the holding in *Lynn's Food* was *Martinez v. Bohls Bearing Equip. Co.*, 361 F. Supp. 2d 608 (W.D. Tex. 2005). In *Martinez*, the plaintiff complained he had not been paid for overtime work. The employer offered him $1,000.00 in full satisfaction of his claim, and the plaintiff accepted the payment even though he believed he was owed nearly $3,500.00. Later, the plaintiff filed a federal discrimination lawsuit against the employer and reasserted his FLSA claim. The employer moved for summary judgment and argued that the plaintiff had released his FLSA claim for overtime benefits when he signed the settlement agreement. *Id.* at 618. After conducting a lengthy and comprehensive review of the legislative history of the FLSA, subsequent amendments, and judicial interpretations addressing the issue, *Martinez* concluded that the strict holding in *Lynn's Food* was largely driven by its facts—"'employees had not brought suit, were largely unaware of the fact that they had rights under the FLSA, had not consulted with an attorney before signing the agreements, and many did not speak English.'" *Id.* at 628 (citing *Lynn's Food*, 679 F.2d at 1355). *Martinez* ruled that where there is a "bona fide dispute as to the amount of hours worked or compensation due," court approval of the agreement is unnecessary and parties may reach private compromises. *Id.* at 631.

In coming to this ruling, *Martinez* observed that after *O'Neil* and *Gangi*,

> an overwhelming amount of litigation was generated and employer cooperation with the FLSA's requirements was discouraged. . . . As was noted by Congress in 1949, one of the most important reasons for the decline in voluntary restitution by employers was the fact that an employer who pays back wages which he withheld in violation of the [FLSA] has no assurance that he will not be sued for an equivalent amount plus attorney's fees under the provisions of section 16(b) of the [FLSA].

*Id.* at 622 (internal quotations and citations omitted).

While the Court will not repeat the in-depth analysis conducted by *Martinez*, it will

note the following rational provided by the decision:

> Judicial caseloads, as well as the workload of the Wage and Hour Administration, would likely be swamped with unnecessary disputes, many dubious and with little evidence, that could not be finally settled without approval from either a court or the Secretary of Labor. This surely cannot be what was intended by Congress when the FLSA was passed. In fact, less than ten years after the passage of the FLSA, Congress amended the statute to provide for compromises of then-existing claims involving bona fide disputes. Though Congress could have made the express availability of such compromises prospective, rather than purely retrospective, it did not prohibit such compromises. Congress left this decision to "determination under other law."

*Id.* at 630–631 (quoting Portal–to–Portal Act of 1947, H.R. Cong. Rep. No. 326, 80th

Cong., 1st Sess. 12 (1947)).[6] *Martinez* recognized a clear distinction between bona fide

disputes as to *coverage* versus *liability*. The opinion acknowledged that *Gangi* stood for

the proposition that claims for minimum or overtime wages could not be compromised

because of disputes as to coverage, but that it contained "no discussion as to the ability

to compromise claims because of disputes as to liability, such as where the amount due

was unclear." *Id.* at 625.

The holding in *Lynn's Food* was first challenged in this District by *Ruiz*. There,

Judge Krieger found "*Martinez's* reasoning to be thorough, careful, and persuasive, and

---

[6] Section 3 of the Portal-to-Portal Act, codified at 29 U.S.C. § 253, reads as follows.

> Any cause of action under the [FLSA] which accrued prior to May 14, 1947, or any action (whether instituted prior to or on or after May 14, 1947) to enforce such a cause of action, may hereafter be compromised in whole or in part, if there exists a bona fide dispute as to the amount payable by the employer to his employee; except that no such action or cause of action may be so compromised to the extent that such compromise is based on an hourly wage rate less than the minimum required under such Act, or on a payment for overtime at a rate less than one and one-half times such minimum hourly wage rate.

adopt[ed] it with a few further observations." *Ruiz*, 2017 WL 11545275, at *2. *Ruiz* ruled

that "an FLSA claim that is *genuinely disputed* by the employer may be compromised

via a private settlement between the parties, and [such] settlement will be legally

effective regardless of whether they are submitted to or approved by the trial court." *Id*.

at *3 (emphasis added). *Ruiz* did not, however, offer any guidance on how to identify

when claim is "genuinely disputed." The opinion drew no distinction between bona fide

disputes over coverage and bona fide disputes over liability—seemingly broadening the

holding in *Martinez*.

　　Since *Ruiz*, however, many cases from this District have continued to approve

FLSA settlement agreements by applying *Lynn's Food*. These cases did not address

*Ruiz* or challenge *Lynn's Food. See e.g.*, *Prim*, 2017 WL 3641844; *Swanson v.

Cathedral Energy Servs., Inc.*, No. 17-cv-01578-DDD, 2019 WL 4858453 (D. Colo. Oct.

2, 2019). Other cases have acknowledged *Ruiz* but, recognizing the legal uncertainty on

this issue, decided to review the settlement agreements anyway. *See e.g.*, *Manohar v.

Sugar Food LLC*, No. 16-cv-02454-NYW, 2017 WL 3173451, at *2 (D. Colo. July 26,

2017) ("Because the issue is not yet settled by the Tenth Circuit, this court proceeds

with applying the standard utilized by courts in this District to consider whether it can

approve the settlement."); *Teague v. Acxiom Corp.*, No. 18-cv-01743-NYW, 2018 WL

3772865, at *1 (D. Colo. Aug. 9, 2018). In those cases, however, the request for judicial

review came before the court in the form of a joint or unopposed motion for approval of

the settlement agreement. Unlike in the present matter, those decisions were not forced

to contend with the propriety of judicial review of FLSA settlement agreements.

This Court finds that the holding in *Martinez* was driven in large part by outcomes-based considerations: reducing judicial caseloads and encouraging voluntary restitution and FLSA compliance by employers. *Martinez* was concerned that in a *Lynn's Food* world, employers would have no incentive to voluntarily pay overdue wages to employees without assurance that they would not subsequently be sued for an equivalent amount in liquidated damages plus attorney fees. The strongest critique of the rationale in *Martinez* comes from Judge Steven D. Merryday's opinion in *Dees v. Hydradry, Inc.,* 706 F. Supp. 2d 1227 (M.D. Fla. 2010). As Judge Merryday points out in *Dees*, whether or not unsupervised private settlements of FLSA claims are allowed, there remain various incentives for employers to not voluntarily comply with the FSLA.

> An employer who pays less than the minimum wage or who pays no overtime has no incremental incentive to comply voluntarily with the FLSA, if, after an employee complains, the employer privately compromises the claim for a discount[—]an amount less than the full amount owed under the FLSA (plus, with savvy negotiation, a confidentiality agreement to preclude the spread to other employees of information about the FLSA). If approval is required, the discount might become unavailable and the undiscounted principal owed the employee might increase (for example, as a result of liquidated damages or a more refined damage computation), both of which unhappy prospects conduce to voluntary compliance by the employer.

*Dees*, 706 F. Supp. 2d at 1237. Judge Merryday further takes issue with *Martinez*'s distinction between bona fide disputes that may be subject to private compromise and the category of "non-bona fide FLSA disputes requir[ing] approval by the Department of Labor or the district court" in the absence of any "explanation of the mechanisms by which . . . the bona fides of the dispute are reliably identified." *Id.* Indeed, the primary difficulty in applying the holdings of *Martinez* and *Ruiz* is the lack of an agreed upon definition of "bona fide dispute." In the absence of a standard definition, courts have used various criteria to identify bona fide disputes. *See, e.g.*, *Carrillo v. Dandan Inc.*, 51

F. Supp. 3d 124, 133 (D.D.C. 2014) (finding the parties presented a bona fide dispute because the parties disagreed as to the accuracy of the employee's time slips, whether travel was reasonably compensable, and if money was advanced to the employees); *Martinez,* 2022 WL 782782, at * (finding that a bona fide dispute does not exist if the employee is unrepresented when agreeing to settle an FLSA claim); *Fails*, 2018 WL 6046248, at *3 (suggesting that a bona fide dispute does not exist when "there is evidence of malfeasance or overreaching in obtaining a settlement agreement").

After addressing the above shortcomings of the reasoning in *Martinez*, the court in *Dees* went on to adopt the Eleventh Circuit's position in *Lynn's Food* and proceeded "on the logical and salutary premise that the FLSA, a statute famously designed to preempt in certain particulars the possibility of private agreement, remains immune to the unsupervised intrusion of a private agreement . . . ." *Dees*, 706 F. Supp. 2d at 1237.

The appeal of the holding in *Lynn's Food*—requiring approval of each FLSA compromise irrespective of the nature of the dispute—lies in its simplicity. On the other hand, per *Martinez* and *Ruiz*, the court must first determine whether a bona fide dispute existed at the time of the settlement agreement and what the dispute was about, to then decide whether judicial scrutiny is appropriate. This is a fact-intensive inquiry that would need to be conducted each time an FLSA agreement is presented to the court for approval or enforcement.[7] As other courts in this District have held, "[t]he mere existence of an adversarial lawsuit is not enough to satisfy the bona fide dispute

---

[7] In the absence of such judicial inquiry, there exists the risk that parties seeking enforcement of an FLSA settlement will simply stipulate that their settlement resolves "a bona fide dispute" when it, in fact, does not—undermining the purposes of the statute. This is all the more likely to occur due to the lack of consensus on the definition of a bona fide dispute.

requirement." *Baker*, 2014 WL 700096, at *1. The Court is not persuaded that this
approach, relative to mandating district court or DOL approval for all FLSA settlement
agreements, would have any meaningful impact on judicial caseloads. Furthermore, in
certain cases, it may not be so easy to disentangle bona fide disputes over coverage
from disputes over liability.

Having conducted a review of the existing caselaw, the Court finds the reasoning
in *Dees* to be persuasive and accordingly adopts the holding in *Lynn's Food*. In the
absence of further guidance from the Tenth Circuit, this Court finds that an FLSA
settlement agreement must be presented to the court for approval in accordance with
the factors set forth in *Lynn's Food* to be enforceable.[8] An employer "undertakes the
private resolution of an FLSA dispute at his peril." *Dees*, 706 F. Supp. 2d at 1237.

It is worth noting that the facts of this case are distinguishable from other cases
in this District that have found that judicial approval of settlement agreements to not be
required. Perez testified that Defendant discouraged him from consulting with counsel
prior to signing the settlement agreement. ECF No. 98 at 36:12–13 ("They said not to
talk to [counsel] because [counsel] would keep my money."). Suarez testified that Mr.

---

[8] In its previous Order, this Court, following *Ruiz* and *Fails*, found that "it [was] not
required to review the 61 $500 settlement agreements, but that it may do so if the
settlement agreements are 'claimed to be coercive, deceptive, or overreaching,'" ECF
No. 160 at 18 (quoting *Ruiz*, 2017 WL 11545275, at *3). In that prior Order however, the
issue of the propriety of judicial review of FLSA settlements was not squarely before the
Court and was not fully briefed by the parties. Upon closer consideration, this Court
finds that judicial scrutiny of FLSA settlements serves to effectuate the legislative
policies behind the FLSA. When a settlement is submitted to the court for approval, it "is
more likely to reflect a reasonable compromise of disputed issues than a mere waiver of
statutory rights brought about by an employer's overreaching." *Lynn's Food Stores Inc.*,
679 F.2d at 1354. Furthermore, even under the construction of *Ruiz* and *Fails*, the Court
has the discretion to carefully review the agreements in this case in light of the
allegations of coercion and deception.

Meza told him the check "was a return of money from the IRS." *Id.* at 56:9–57:8; 61:1–4

("[W]hen I talked to [Mr. Meza] he said it's okay that money is an IRS refund to Denco,

and since you worked for Denco it's being divided among all of the people who worked

for Denco."). Additionally, this Court has previously found 61 similar agreements that

Defendant entered into with its employees were presumptively invalid. See ECF No.

160 at 22 ("The Court is extremely troubled by the fact that [Defendant] handed out form

agreements to its employees—which did not reference this lawsuit—mere days after

class action claims arose in this case. All of the above facts lead to the conclusion that

[Defendant] was resorting to subterfuge, misdirection, or coercion to improperly induce

employees into surrendering their FLSA rights for pennies on the dollar.") (internal

quotations and citations omitted). These allegations of fraud and overreaching, and the

history of this case, alone warrant judicial scrutiny. This case perfectly exemplifies why

"leaving an FLSA settlement to wholly private resolution conduces inevitably to

mischief." *Dees*, 706 F. Supp 2d at 1237, *cf. Lee v. Best Budz LLC*, No. 19-cv-02430-

KMT, 2019 WL 5964966, at *3 (D. Colo. Nov. 12, 2019) (finding that judicial scrutiny

was not required where employees actively participated in negotiations, the agreement

involved payment to counsel, and there did not otherwise "appear to be a defect, in

either the [a]greement, itself, or in the settlement process"); *Lawson v. Procare CRS,

Inc.*, No. 18-cv-00248-TCK-JFJ, 2019 WL 112781, at *3 (N.D. Okla. Jan. 4, 2019)

(finding court approval not required where "it [was] unlikely that the settlement [was] a

result of undue pressure or poor or nonexistent legal advice").

      Finally, though "there is disagreement over whether FLSA settlements *must* be

approved by the [c]ourt, there does not appear to be disagreement at this time over

whether FLSA settlements *may* be approved by the [c]ourt." *Slaughter v. Sykes Enters.,
Inc.*, No. 17-cv-02038-KLM, 2019 WL 529512, at *6 (D. Colo. Feb. 11, 2019).
Accordingly, in the following sections the Court will examine the settlement agreements
at issue in this case using the standard set forth in *Lynn's Food*.

### b.  Enforceability of Agreements Signed by Plaintiffs Perez and Orantes

Parties seeking approval of an FLSA settlement must provide the court with
sufficient information to determine whether a bona fide dispute exists. *Dees*, 706 F.
Supp. 2d at 1241. To be fair and reasonable, a FLSA settlement must provide adequate
compensation to the employees and must not frustrate the FLSA's policy rationales. *Id.*
In the context of a joint motion for approval of an FLSA settlement, courts in this District
have looked to the following information to determine whether a bona fide dispute
exists: "(1) a description of the nature of the dispute; (2) a description of the employer's
business and the type of work performed by the employees; (3) the employer's reasons
for disputing the employees' right to a minimum wage or overtime; (4) the employees'
justification for the disputed wages; and (5) if the parties dispute the computation of
wages owed, each party's estimate of the number of hours worked and the applicable
wage." *Baker* 2014 WL 700096, at *1.

Based on the evidence in the record, the Court cannot find that the settlement
agreements signed by Perez and Orantes reflected a compromise of a bona fide
dispute as to the amount owed at the time the settlement agreements were entered into.
In its motion, Defendant does not seem to dispute the number of hours worked by Perez
and Orantes or the applicable wage rate to those hours. While the Court is in
possession of a spreadsheet put together by Plaintiffs' counsel claiming that Perez was

owed around $40,000 in unpaid wages for three years of employment (excluding any punitive or liquidated damages) and Orantes was owed around $29,000, ECF No. 100-3, Defendant has not provided the Court with their own calculations. *See Archer v. TNT USA, Inc.*, 12 F. Supp. 3d 373, 387 (E.D.N.Y. 2014) ("[T]he parties have not adduced any evidence that their settlement resolves a 'bona fide dispute' over hours or rates of pay and does not compromise the non-waivable substantive rights afforded by the FLSA. Without that proof, this Court cannot approve a settlement of the plaintiff's FLSA claim.").

At oral argument, when the Court asked Defendant how it arrived at the amount of the initial unconditional tenders and subsequent checks of $12,000 to both Perez and Orantes, counsel for Defendant was unable to provide any clear explanation. *See* ECF No. 137 at 16. In fact, rather than disputing the estimates provided by Plaintiffs' counsel, defense counsel stated that it was her understanding that "[the amount] was based upon what was alleged in the [C]omplaint and what [Plaintiffs'] understanding was of the hours [Plaintiffs] worked for [Defendant]." *Id.* Counsel for Defendant further explained, "sometimes employers also make decision to tender amounts that it feels are in dispute, but in order to avoid penalties, pay it anyway." *Id.* An employer's unsubstantiated "feeling" that an employee's claimed amount of unpaid wages is disputed does not, by itself, create a *genuine* dispute as to liability. What defense counsel is describing is a situation where an employee (begrudgingly) cuts an employee a check for whatever amount he claims he is owed, in order to avoid paying liquidated damages or any statutory penalties. This is squarely the kind of conduct that the Supreme Court found objectionable in *O'Neil*. *See O'Neil*, 324 U.S. at 708 ("[P]rohibit[ing] . . . employees from

bargaining with their employer in determining whether so little damage was suffered that waiver of liquidated damage is called for."). Moreover, the fact that both Perez and Orantes were issued a check for exactly $12,000, despite having worked for Defendant for different lengths of time, severely undermines Defendant's position that the settlements were the result of any individualized determinations or meaningful negotiations. For these reasons, the Court cannot find that a bona fide dispute existed as to amounts owed, much less that the settlements were fair and reasonable.

The agreements are also defective under the *Lynn's Food* test due to the lack of any attorney fees provision. Rather than providing for attorney fees, the agreement includes a waiver for "all claims concerning attorney fees, costs, and any and all other expenses related to the claims released . . . ." ECF No. 112-5. Thus, the Court finds that the settlement agreements signed by Perez and Orantes are not enforceable.[9]

---

[9] Though this argument is not raised by Plaintiffs, the Court notes that the settlement agreements would likely have warranted judicial scrutiny due to the extensive "Release of Claims" provision. Pursuant to this provision, the employee agreed to release Defendant from all claims arising under a laundry list of federal and state statutes, including Title VII, the Age Discrimination in Employment Act (ADEA), the Americans with Disabilities Act (ADA), the Colorado False Claims Act, Colorado Whistleblower law, and so on. ECF No. 112-5. The provision further released Defendant from "any claims" under tort or contract law that "relate to, arise out of, or involve, any aspect of Employee's employment with [Defendant]." While the agreement does contain a severability provision, that provision reads "If one or more of the provisions, or portions thereof, of this Agreement are determined to be illegal or unenforceable, the remainder of this Agreement shall not be affected…. Provided, however, that if the [Release of Claims] provision of this Agreement [is] determined to be illegal or unenforceable…this Agreement shall be rendered null and void in its entirety." *Id. See Dees*, 706 F. Supp. 2d at 1240 (M.D. Fla. 2010) ("To the extent that the employee receives a full wage but relinquishes something else of value, the agreement…involves a 'compromise', and *Lynn's Food* requires judicial approval of the compromise.").

### c. Enforceability of Agreements Signed by Plaintiff Suarez

The nature and circumstances of the settlement agreement with Suarez are almost identical to those of the other 61 former Spanish-speaking employees of Defendant who all signed settlement agreements that were provided only in English and received a check for exactly $500. In each of those 61 instances, the signing occurred between December 24, 2024 and December 31, 2024—mere days after the operative complaint was amended to include class action claims. In an Order dated September 12, 2025, this Court found those 61 settlement agreements to be presumptively invalid.[10] *See* ECF No. 160 at 20 (concluding that "[Defendant] was resorting to subterfuge, misdirection, or coercion to improperly induce employees into surrendering their FLSA rights for pennies on the dollar") (internal quotations and citation omitted).

While Suarez signed the settlement agreement prior to when the complaint was amended to include class action claims, the agreement was provided only in English, despite Suarez only understanding the words "yes" and "no." ECF No. 98 at 51:11–16. Suarez was unrepresented by counsel at the time he signed the agreement, which made no mention of this lawsuit or the fact that any litigation was ongoing.[11] There is no

---

[10] At the time of the Order, none of the 61 employees had joined the suit as opt-ins and the Court had not yet determined whether preliminary certification under Fed. R. Civ. P. 23 was warranted. Accordingly, this Court denied Plaintiffs' request to invalidate the 61 settlement agreements without prejudice. The agreements between Defendant and named Plaintiffs Perez, Orantes, and Suarez, were not the subject of that Order.

[11] *See Serna v. Bd. of Cnty. Comm'rs of Rio Arriba Cnty.*, No. 17-CV-196-RB-KBM, 2018 WL 4773361, at *4 (D.N.M. Oct. 3, 2018) (emphasizing that both sides were represented by counsel and that "the facts and legal arguments have been well-developed through the adversarial litigation process"); *Lawson*, 2019 WL 112781, at *2 (suggesting a bona fide dispute does not exist if a party is unrepresented); *Riley v. D. Loves Restaurants, LLC*, No. CV 20-1085 WJ/KK, 2021 WL 1310973, at *4 (D.N.M. Apr. 8, 2021) (finding judicial approval unnecessary in part because plaintiff was represented by counsel).

evidence in the record that Suarez, in signing away his FLSA rights, knew how much back wages or overtime he would have been entitled to under the FLSA. Indeed, the fact that both Perez and Orantes—employees who had counsel—received significantly larger settlement payments for giving up their FLSA claims is "prima facie evidence that [Defendant] was trying to, and did take advantage, of [an] unrepresented employee[] to buy themselves out of a potential lawsuit on the cheap." ECF No. 160 at 20. Finally, there is no logical nexus between the $500 that Saurez received and the actual back wages he was owed. Under these circumstances, the Court cannot find that the agreement signed by Suarez is enforceable.

## III.    RECOMMENDATION

For the reasons set forth above, it is hereby **RECOMMENDED** that Defendant Denco Construction LLC's Motion to Enforce Settlement Agreements, filed April 3, 2025, ECF No. 112, be **DENIED.**[12]

Dated at Denver, Colorado this 31st Day of December 2025

N. Reid Neureiter
United States Magistrate Judge

---

[12] Neither party raises the issue of whether the settlement agreements should be found enforceable as to the state law claims in the event that the portions relating to the FLSA are invalidated. Because this issue is not raised, the Court does not address it here.